### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CR-10080-GAO[1]** |
| | ) | |
| **LINDA LOUISE CULKIN,** | ) | |
| **Defendant** | ) | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVIEW OF DETENTION ORDER BY DISTRICT COURT JUDGE

The Court should deny Defendant's Motion for Review of Detention Order by District Court Judge, and should instead let the order of detention stand without modification.

### *FACTS[2]*

Defendant Culkin was charged in a criminal complaint with violating 18 U.S.C. § 875(c) by transmitting in interstate and foreign commerce threats to injure the person of another.[3]  From July 2009 to April 2010, or thereabout, around twenty threats were mailed to K.S., the places where he worked, or other people associated with him.  Detention 1 Tr. at 6:16-7:11.  The mailed threats included threats to harm certain people and companies and to use bombs and anthrax.  Detention 1

---

[1] Defendant's motion was filed under the magistrate case number, 12-MJ-7003-JCB, but the case number changed to 12-CR-10080-GAO after the Government charged Defendant by information (with Defendant's consent).

[2] The facts come from the testimony of Postal Inspector Sean Boyce at the detention hearing, the transcript of which is cited herein as Detention 1 Tr. at ___, the representations of the parties at the follow-up detention hearing, the transcript of which is cited herein as Detention 2 Tr. at ___, and the allegations in the affidavit submitted to apply for the complaint, which is cited as Complaint Aff. ¶ ___.

[3] The information charges Defendant with the same charge, plus additional charges of violating 18 U.S.C. § 876(c) by mailing threatening communications and violating 18 U.S.C. § 1038 by transmitting false information and hoaxes regarding an explosive device and a biological agent or toxin. [Dkt. # 13.]

Tr. at 7:12-11:2; Complaint Aff. ¶¶ 8, 10-12.  The anthrax threat included a powder that was later

determined not to be anthrax.  Detention 1 Tr. at 10:15-19.[4]

Defendant became a suspect because the threats had been mailed through Boston and one of

the threats held the faint physical impression of Defendant's name and address.  Detention 1 Tr. at

11:6-12:13; Complaint Aff. ¶ 9.  When a police detective asked Defendant about the mailings,

Defendant claimed that someone had someone had held her and her husband at gunpoint and stolen

their mail and possibly their passwords for library computers.  Detention 1 Tr. at 12:16-13:10.  When

postal inspectors questioned Defendant about the mailings, Defendant repeated the story.  Detention

1 Tr. at 13:14-14:5.  During her discussion with postal inspectors, Defendant again said that her

library computer password could have been stolen, which was odd because during this discussion

nobody had mentioned electronic threats.  Detention 1 Tr. at 13:21-14:2.  *See also* Complaint Aff.

¶¶ 24-25.  Defendant's explanations made no sense to investigators.  Complaint Aff. ¶ 25.

Beginning in December 2009 or May 2010,[5] threatening tweets were sent to the Twitter

accounts[6] of K.S. and others associated with K.S. and K.S.'s coworkers.  Complaint Aff. ¶ 14.  The

author threatened to put a bullet in K.S.'s brain and then commit suicide, Complaint Aff. ¶ 14(a);

---

[4] Although the postal inspector testified or implied that the anthrax hoax letter resulted in a full hazmat response, police reports obtained after the detention hearing indicate that the response was much more limited.  Other police reports obtained after the detention hearing indicate that the response to the bomb threat, on the other hand, was substantial, including shutting down foot and vehicle traffic in the vicinity of the threatened area for over two hours in a busy city.  The Government can make these reports available to the Court.

[5] The dates identified in the complaint affidavit and at the detention hearing conflict. *Compare* Complaint Aff. ¶ 14 *with* Detention 1 Tr. at 18:16-19.

[6] Twitter is a service that allows people to publish and send each other short messages over the Internet, messages that are called "tweets."  A fuller discussion of Twitter and tweets is found at Complaint Aff. ¶ 5 and Detention 1 Tr. at 15:12-16:8.

that K.S. was alive only because the threatener had allowed him to live, *id.* ¶ 14(b); that K.S. would

be tortured, *id.* ¶ 14(c); that K.S. would be disemboweled, *id.* ¶ 14(d); that K.S. should wait for an

explosion, *id.* ¶ 14(e); that K.S. would receive a letter full of anthrax, *id.* ¶ 14(g); and more bomb

threats, *id.* ¶ 14(h)-(j).  There were numerous threats over a number of days.  When KS and others

tried to block certain Twitter accounts from sending them threats, new accounts would renew the

assault  Detention 1 Tr. at 16:9-17:1.  In September 2011, some e-mails were sent to a couple places

threatening to blow up K.S.'s workplace if he did not resign.  Complaint Aff. ¶ 15.  Events came to

a head on December 30, 2011, when somebody made multiple bomb and shooting threats via Twitter

to K.S.'s then-current workplace.  Complaint Aff. ¶ 32; Detention 1 Tr. at 18:20-19:11.

The threatening tweets and e-mails described above were made on computers that Defendant

Culkin had accessed: computers at two of her former employers, at two public libraries that she

frequented, and at the apartment of her friend next door.  Complaint Aff. ¶¶ 27-32; Detention 1 Tr.

at 22:8-27:6.  Defendant was identified by personnel at one library as using the library's computers

on December 30, 2011, the date of the most recent threatening tweets, and computer records

indicated that the threats had come from that library.  Detention 1 Tr. at 27:7-16; Complaint Aff. ¶

32.  Surveillance cameras also caught Defendant using the library's computers during the specific

times that the threats were sent from that library.  Detention 1 Tr. at 27:17-28:16.

Although initial suspicion fell in part on Defendant's next-door neighbor, a search of her

apartment turned up nothing suspicious (other than her computer).  Complaint Aff. ¶ 31, Detention

1 Tr. at 33:2-20.

But there was ample evidence that Defendant was responsible for the threats.  In addition to

all of the evidence mentioned above, a search of Defendant's apartment turned up a vast amount of

evidence of Defendant's obsession with K.S., Twitter, and the threats.   Defendant's apartment

contained the following incriminating items:

a.      a picture of K.S. with his eyes blacked out and mouth scribbled out, his name

written repeatedly in the margin, and seeming instructions on the reverse side

saying,

> Blacken the eyes,
> Write his name
> 6 times, all connected,
> Cross no "t's"
> Dots no "I"'s
> Fold it
> Twice + put
> It in Your pocket
> Dove's blood?
> SEW up mouth

b.      a handwritten note in a small flowered notebook stating that she had been

beaten up, received threats to her and her family, her cell phone stolen, and

questioning in the margin, "Because of [K.S.]?";

c.      multiple copies of a page with "Killing [K.S.]" typewritten or

computer-written in the upper left-hand corner, with what appear to be copies

of 17 excerpted Internet materials concerning K.S., including one claiming

that people would put him "6 foot under" and really meant to kill him;

d.      a printout of an Internet discussion describing an incident involving police

cars and closing a street in K.S.'s city on September 19, 2009, at the top of

which was handwritten, "Sept. 19, 2010 2009 [workplace]?  They said bomb

threats were called in?";

4

     e.      multiple Internet printouts regarding K.S., his life, his usage of Twitter, and threats against him;

     f.      a two-page recent printout of what appeared to be K.S.'s Tweets reproduced on another website, including a Tweet from K.S. noting that he had been the victim of harassment via Twitter; and

     g.      a library slip pertaining to a book about John Wayne Gacy, the serial killer.

Complaint Aff. ¶ 18; Detention 1 Tr. at 28:22-31:22. Defendant's next-door neighbor also told the case agent about Defendant's obsession with K.S. and Twitter:

> Ms. Doe told me that Ms. Culkin had been her friend for years and would occasionally have free access to Ms. Doe's apartment. Ms. Doe said that Ms. Culkin had used her (Ms. Doe's) computer multiple times a week and claimed to be using Ms. Doe's home computer to monitor threats posed to K.S. Ms. Doe told us that in or around 2010, she became concerned that Ms. Culkin was using Twitter accounts on Ms. Doe's computer and asked Ms. Culkin to stop doing so. (She did not explain why she was uncomfortable with Ms. Culkin's use of Twitter.) Ms. Culkin then asked Ms. Doe to access Twitter's website herself and to search Twitter for mention of K.S. On January 6, 2012, Ms. Doe clarified that Ms. Culkin had an obsession with Twitter, had asked Ms. Doe multiple times to view material associated with K.S. on Ms. Doe's computer, and claimed to be following K.S. on this computer to protect him and to protect herself.

Complaint Aff. ¶ 31; *see also* Detention Tr. 1 at 34:14-36:16. A preliminary review of the neighbor's computer confirmed that Defendant had used it. Detention Tr. 1 at 33:21-34:10. And Defendant ultimately confessed to making the threats. Detention Tr. 1 at 40:16-42:10.

     Although Defendant ultimately confessed to the crime, she engaged in a lot of deception along the way. As mentioned above, Defendant told the police and postal inspectors nonsense stories about how someone had stolen her mail to explain away the mailed threats. She also moved

from mailed threats to threats over the more anonymous Internet, never used a computer at her apartment, and switched Twitter accounts when her threats were blocked. Even when using computers at the libraries, Defendant did not check the computers out using her own library card, but instead used a guest account. Detention 1 Tr. at 26:4-27:6. During the search of her apartment, Defendant taunted the case agent by telephone that he would not find any evidence there. Detention 1 Tr. at 31:23-32:11. Many of the items found by the search team appeared as if they had been hidden inside her cat's play structure, under rugs, stuffed inside chairs and couches, and behind a credenza. Complaint Aff. ¶ 20; *see also* Detention 1 Tr. at 32:23-33:1.[7] And after the search, but before her confession, Defendant claimed that the threats had been made by her next-door neighbor Detention 1 Tr. at 37:10-38:21.

Two of the victims, K.S. and D.B., submitted victim impact statements that described how the threats had caused them fear, emotional turmoil, and had affected their everyday personal and business lives. Although the magistrate judge ruled that the victims' reactions to the threats were irrelevant, Detention 1 Tr. at 42:15-23, the magistrate judge erred, because the victims' reactions are relevant to determine whether a reasonable person would consider the defendant's statements to be threatening. *See United States v. Whiffen*, 121 F.3d 18, 23 (1st Cir. 1997) ("This evidence regarding the reaction of the listeners [to the threats] is not conclusive, but it does suggest that at least these individuals perceived the statements to be threats.").

In addition to the threats' overall incessant promise of death and mayhem, several other factors suggested danger. The first was Defendant's criminal record, which included imprisonment

---

[7] Although Defendant was not at the apartment during the search, her husband was. Because Defendant told the case agent by telephone that he would not find any evidence, the inference is that Defendant told her husband to hide the evidence.

in the early- to mid-'90s to threatening murder, stalking, trespassing, two counts of carrying a dangerous weapon (a razor knife on one occasion, a straight razor on another), and malicious destruction of property.  The second was that after the search, Defendant told the case agent that she intended to travel to New York City, which the case agent knew was where K.S. was working at the time, and where the latest Twitter bomb threats had been received.  Detention 1 Tr. at 37:18-38:3.

Defendant's criminal record also includes defaults and violations of probation.

## *ANALYSIS*

There are three bases for detaining Defendant: dangerousness/crime of violence, 18 U.S.C. § 3142(f)(1)(A); a serious risk of flight, § 3142(f)(2)(A); and a serious risk of threats against a witness, § 3142(f)(2)(B).

Magistrate Judge Boal correctly held that the Government must show clear and convincing evidence that Defendant poses a danger to the safety of any person or the community, by the preponderance of the evidence that Defendant poses a serious risk of flight, or clear and convincing evidence that Defendant poses a serious risk of threatening witnesses.  § 3142(f); Order on Government's Motion for Detention [Dkt. # 7] at 3.  The Government has carried these burdens.

Moreover, in this case there is "a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person or the community." § 3142(e)(2). The presumption arises under § 3142(e)(2) if Defendant is charged with a crime listed in § 3142(f)(1), such as a crime of violence, and Defendant was earlier convicted of a federal or state crime of violence.  *See* § 3142(e)(2)(A).  In this case, Defendant is charged with a crime of violence within the meaning of § 3142(f)(1).  *See* Order on Government's Motion for Detention at 5

(concluding that Defendant was charged with a crime of violence).[8]   According to her criminal record, Defendant was earlier convicted for state crimes of violence such as threatening to commit murder, stalking, malicious destruction of property, and carrying a dangerous weapon. Consequently, the conditions of § 3142(e)(2) are fulfilled, and there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person or the community.

That rebuttable presumption is amply supported by the facts.  To begin with, Defendant's threats promised gruesome violence: bullets to the head, torture, disembowelment, explosives, and anthrax.  Defendant makes much of the fact that she never carried through these threats.  But the fact that she hadn't does not mean that she wouldn't.  Defendant's friend called her obsessed, and the items in Defendant's apartment also refer to violence, killing KS, and an interest in a serial killer. Defendant's prior criminal record may be old, but it contains multiple crimes of violence, including two convictions for carrying a dangerous weapon, and a one-year restraining order against her.  Even after the search of her apartment, Defendant told the case agent that she intended to travel to New York City; she claimed an innocent pretext for doing so, but New York City was the location of K.S. and the last building that she had threatened to bomb.  All of these indicate Defendant's intent to act.

Moreover, even if Defendant meant only to talk big, her talk itself posed a real harm to the victims and the community.  Her talk alone caused the victims real fear and emotional turmoil.  And her talk alone posed a danger to the community by taking up law enforcement resources.  Every moment investigating Defendant's threats is a moment taken away from investigating other crimes. At one point, her talk alone closed down part of a city for over two hours.

---

[8]   Defendant has not contested this ruling.

Defendant also poses a serious risk of flight.  Although Defendant did not run after the search of her apartment, her situation now is very different.  Now she has been arrested and charged with federal felonies whose Sentencing Guideline Range, as computed by the Government, is 46-57 months.  She has every reason to avoid imprisonment now, having been imprisoned in the '90s and then again more recently.  Moreover, Defendant's past conduct indicates that she is not amenable to supervision.  In prior criminal cases, Defendant had defaults and violations of probation.  During this investigation, when police and postal inspectors contacted her, she lied to them, and instead of stopping the crime, she moved from mailings to the more anonymous arena of the Internet. Defendant took steps throughout the crime to hide her identity and conduct.  And at the end of the investigation, Defendant taunted the case agent that he would find no evidence in her apartment, she appears to have asked her husband to hide the evidence that was there, and blamed the threats on her friend next door.  All of these facts suggest that Defendant does not respond to law enforcement or court-ordered supervision well.

Defendant's claim that the experience has humbled her and caused her to turn over a new leaf should be met with deep suspicion.  Defendant's friend says that Defendant is obsessed with K.S. and the threats, and the evidence from her apartment is further proof of that obsession.  Claiming that the obsession is broken is easy, but an obsession cannot be turned off like a light switch.

The magistrate judge's finding of no evidence that Defendant would attempt to threaten witnesses neglected to consider the likelihood that upon release, Defendant would likely continue to threaten K.S., D.B., and her other earlier targets.  All of the victims would likely be witnesses at trial or sentencing.  Given the likelihood that upon release Defendant would return to her old ways, there is a serious danger that Defendant would return to threatening the victims.

9

Against all this, Defendant suggests that home confinement with electronic monitoring and restricted access to the Internet would suffice. Electronic monitoring would not necessarily keep Defendant out of her next-door neighbor's apartment, Order of Detention at 6, which does have telephone and Internet access. Electronic monitoring would not keep Defendant from mailing threats, as she has in the past. Electronic monitoring would not keep her from cutting off the bracelet and leaving before authorities could respond.

Given Defendant's obsession, her past defaults and violations of probation, her past interactions with law enforcement during this investigation, the serious penalties in front of her, and the ease with which a horrendous threat can be communicated, home confinement with electronic monitoring is not sufficient to ensure the safety of the victims or the community, the victims' freedom from future threats or harm, and Defendant's presence at future hearings.

For these reasons, Defendant's detention should continue unaltered.


Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     /s/ Scott L. Garland
        SCOTT L. GARLAND
        Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed through the ECF system and therefore will

be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>*/s/ Scott L. Garland*</u>
SCOTT L. GARLAND
Assistant U.S. Attorney

Date: March 28, 2012